IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2023

## STATE OF TENNESSEE v. AMANDA HELENA ROGERS

**Appeal from the Circuit Court for Maury County**
**No. 29080A  Stella L. Hargrove, Judge**

_____

**No. M2022-01328-CCA-R3-CD**

_____

The defendant, Amanda Helena Rogers, appeals her Maury County Circuit Court jury convictions of facilitation of attempted first degree murder, facilitation of vandalism of property in an amount of $2,500 or more but less than $10,000, and two counts of reckless endangerment for which the trial court imposed an effective term of 10 years and six months to be served in confinement. On appeal, the defendant asserts that the evidence is insufficient to support her conviction of facilitation of attempted first degree murder and that the trial court erred in imposing the sentence. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR. and TIMOTHY L. EASTER, JJ., joined.

Michael D. Cox, Columbia, Tennessee, for the appellant, Amanda Helena Rogers.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

As the result of a series of shootings that occurred in a mobile home park in Maury County on October 4, 2020, the Maury County Grand Jury returned an indictment charging the defendant and her co-defendant, Leonard Harrison Beard, Jr., with attempted first degree murder of Justin Barnhill resulting in serious bodily injury, attempted first degree murder of Jerry Dwight Humphrey, attempted first degree murder of Toni

Schreffler, reckless endangerment by shooting into an occupied habitation belonging to Kerry Wiley, vandalism of property in an amount of $2,500 or more but less than $10,000, and coercion of a witness. The co-defendant also was charged with possessing a firearm as a convicted felon and employing a firearm during the commission of a dangerous felony. The joint trial of the defendant and the co-defendant commenced on February 28, 2022.

Kerry Wiley testified that in October 2020, he lived in a mobile home with his fiancée, Racquel Swauger, and their four children, ranging in ages from seven years to a few months old. His cousin, David, and Toni Schreffler lived in a nearby mobile home. Although the defendant was married to Mr. Wiley's brother, they were separated, and the defendant was in a relationship with the co-defendant at the time of the offenses. The defendant continued to visit Mr. Wiley's family at his home and check on his children.

Mr. Wiley testified that on the night of October 4, 2020, he returned to his home from a grocery store and found Ms. Swauger, three of their children, and Justin Barnhill at the home. Mr. Wiley stated that Mr. Barnhill was "like a brother" to him but acknowledged that Mr. Barnhill was a "junkie," who was addicted to methamphetamine and heroin. Mr. Wiley stated that he previously had an addiction to methamphetamine and heroin but that he stopped using the drugs shortly before his oldest daughter was born in 2018. He acknowledged that in October 2020, he was smoking marijuana on a daily basis.

Mr. Wiley testified that shortly after he returned home, the defendant and the co-defendant arrived and that everything was "fine" until the co-defendant asked him whether he knew anyone who wanted to purchase heroin. Mr. Wiley then ordered the defendant and the co-defendant to leave. The co-defendant and Mr. Barnhill stepped outside, while the defendant remained inside the home telling the children goodbye. Mr. Wiley stated that approximately one to two minutes later, while the defendant was still inside the home, Mr. Wiley opened the front door and saw the co-defendant pointing a gun at Mr. Barnhill. Mr. Barnhill struck the co-defendant and "wrapped him up," and they "hit the ground" and began wrestling. Mr. Wiley said that he heard gunshots "maybe within five seconds" of Mr. Barnhill and the defendant's hitting the ground and that Mr. Barnhill yelled, "He f***ing shot me, he f***ing shot me."

Mr. Wiley ran into his home to retrieve his children. Two of his children were in the bedroom in the back of the home with Ms. Swauger, and his seven-year-old son was sleeping in his bedroom located near the area of the shooting. Mr. Wiley testified that bullets were flying through the bedroom as he retrieved his son and that "glass and drywall dust started, like, flying over my face and hitting the floor. I just picked him up and ran." The following day, Mr. Wiley observed a bullet hole in the wall approximately one foot above the bed in which his son had been sleeping and bullet holes in the bedroom window. Mr. Wiley and Ms. Swauger ran with their children out through the backdoor and

to Ms. Schreffler's home. Mr. Wiley stated that he did not know where the defendant was while he was retrieving his son but that he heard the defendant yelling, "stop it."

Mr. Wiley never saw the vehicle in which the defendant and the co-defendant arrived because the area was too dark. He stated that as he was fleeing, he saw a vehicle travel in the direction of Ms. Schreffler's home and then out of his view. Mr. Wiley remained inside Ms. Schreffler's home for a short period of time before leaving to search for Mr. Barnhill. Mr. Wiley and Jerry Dwight Humphrey searched the area for Mr. Barnhill, but they were unable to locate him. Mr. Wiley testified that as he was searching for Mr. Barnhill, he saw the vehicle that had traveled past Ms. Schreffler's home earlier return from "the way it went." The vehicle traveled down the driveway toward Ms. Schreffler's home, and Mr. Wiley heard gunshots and saw "the little rings of fires coming out of the car" from the passenger's side where the shots were being fired. He stated that the vehicle then "busted a U-turn," "turned around," and "took off." Mr. Wiley did not see the direction in which the car went as he ran back to Ms. Schreffler's home to check on his children.

The search for Mr. Barnhill resumed once the police arrived. Mr. Barnhill's mother arrived at the scene and yelled for Mr. Barnhill, who replied that he was "down here." Mr. Barnhill was located 50 to 75 yards inside a wooded area across from Mr. Wiley's home, and Mr. Wiley stated that Mr. Barnhill sustained a gunshot wound below his knee. Mr. Barnhill was transported by ambulance to a hospital.

During cross-examination, Mr. Wiley testified that as the co-defendant and Mr. Barnhill were on the ground, Mr. Humphrey came around the corner of the home and told everyone to "quiet the hell down." Following the initial gunshot when Mr. Barnhill announced that he had been shot, Mr. Humphrey began assisting Mr. Barnhill in attempting to retrieve the gun. Mr. Wiley stated that he heard nine or 10 additional shots as he was gathering his children. He said that the defendant was still inside the home when the initial gunshot was fired and that the defendant ran out of the home and yelled for the two men to stop as the additional gunshots were fired.

Toni Schreffler testified that on the evening of October 4, 2020, at approximately 9:00 or 9:30 p.m., she was outside walking her dog when she heard a gunshot, followed by screaming and three to five additional gunshots. Brandon Chunn, Mr. Humphrey, Mr. Wiley, and Ms. Swauger, along with their children, ran from Mr. Wiley's home to Ms. Schreffler's home. Mr. Wiley was "frantic" and announced that Mr. Barnhill had been shot. Ms. Schreffler described Mr. Barnhill as "an amazing person when he's sober, but when he's not, it's not pretty." She stated that Mr. Barnhill had substance abuse issues, that she had previously allowed him to stay with her for about two weeks as he attempted to become sober, and that she had to kick him out of her home.

- 3 -

Ms. Schreffler testified that she decided to go outside and search for Mr. Barnhill, but she was unable to locate him after searching for five to 10 minutes. She heard a vehicle and ran back to her home. The backdoor was locked, so she went to the front of her home and saw a black vehicle slowly traveling down her driveway and toward her home. She stated that the vehicle was similar to Mr. Barnhill's vehicle and that she yelled Mr. Barnhill's name several times, thinking that he was in the vehicle. The vehicle slowed to a "creep," and then the driver "hit the gas" and drove into Ms. Schreffler's yard. Ms. Schreffler stated that the vehicle "paused for a second" with its headlights on her and that a floodlight at her home illuminated the area, allowing her to see inside the vehicle. She said that the driver was female, that she was unable to make "a hundred percent" identification, and that when she later viewed photographs, "I was pretty sure it was her. I said it looked just like her." Ms. Schreffler stated that she was able to see the passenger's face, and she identified the passenger as the co-defendant.

Ms. Schreffler testified that she heard three gunshots coming from the passenger side of the vehicle and that she "froze," believing that she had been shot. She stated that at the time of the shooting, she was standing at the corner of her home near where her vehicle was parked. She said that the black car was "completely out of the driveway by the time they were shooting" and was in the grass. She did not recall running inside her home, but she recalled "hearing about three to five more shots" and "grabbing the baby off the couch and just hitting the floor and hiding behind my coffee table." She called 9-1-1 and reported the shooting, and she cooperated with the responding officers.

Ms. Schreffler testified that on the following day, she discovered multiple bullet holes in her vehicle. She took the vehicle to an automobile repair shop where she received an estimate of $3,500 to repair the vehicle. Following a subsequent accident on the interstate, she discovered additional damage where another bullet struck the area around the gas tank.

During cross-examination, Ms. Schreffler testified that Mr. Wiley, Ms. Swauger, their children, Bradley Chunn, and Brandon Mitchell were inside her home when the shooting outside her home occurred. Ms. Schreffler did not know the defendant or the co-defendant prior to the shooting. She said that the police officers did not show her a photographic array. Rather, Mr. Wiley showed her a photograph of the co-defendant from Facebook, and she recognized the co-defendant as the passenger in the vehicle.

Dwight Humphrey, the owner of the mobile home park, testified that on the night of October 4, 2020, he was investigating "a lot of ruckus" and discovered his nephew, Mr. Barnhill, fighting another man. Mr. Barnhill was on top of the man, and Mr. Humphrey heard people saying that "he's got a gun." Mr. Barnhill tried to hold the man's hands to

- 4 -

keep him away from the gun, and Mr. Humphrey attempted to assist Mr. Barnhill. Mr. Humphrey stated that he could not see the gun because it was "pitch dark" outside. He said that he heard one or two gunshots, that a woman exited Mr. Wiley's home, that the man with whom Mr. Barnhill was fighting instructed the woman to "get the A.R., get the A.K," that the woman retrieved a taser from a dark-colored car, and that the taser "went off" when the woman was 10 to 15 feet away from Mr. Barnhill and the other man.

Mr. Humphrey testified that he told Mr. Barnhill to run and that they fled in opposite directions. Mr. Humphrey confirmed that he informed police officers that the man was still shooting as Mr. Humphrey and Mr. Barnhill were fleeing. Mr. Humphrey stated that he saw a vehicle traveling away from the scene and that as he was searching for Mr. Barnhill, he saw the vehicle enter the driveway leading to Ms. Schreffler's home. Mr. Humphrey said that he heard gunshots coming from the area of Ms. Schreffler's home after which the vehicle turned around and exited Ms. Schreffler's driveway.

Mr. Humphrey testified that as he was standing in front of Mr. Wiley's home approximately 75 to 80 feet from the roadway and calling 9-1-1, the vehicle traveled past him at approximately 35 miles per hour. He stated that as the vehicle was passing, he saw "an arm" hanging out of the passenger side window and pointing a gun in his direction. An occupant of the vehicle shot five or six times toward Mr. Humphrey and Mr. Wiley's home and then fled the scene.

During cross-examination, Mr. Humphrey testified that as he was assisting Mr. Barnhill, he did not see the woman hit anyone with the taser. He stated that the woman was 10 to 15 feet away from Mr. Barnhill and agreed that the woman would have been unable to use the taser against Mr. Barnhill at that distance.

Justin Barnhill testified that he failed to attend a prior hearing in which he was subpoenaed to testify because he "didn't want to be known as a snitch." He confirmed that he also did not want to testify at trial. While he was in custody as a result of an arrest for driving under the influence, second offense, he was served with a material witness order, requiring that he remain in custody until he testified at trial. He acknowledged that he had a prior conviction for misdemeanor theft.

Mr. Barnhill testified that he had been addicted to heroin for four or five years and that on the night of October 4, 2020, he planned to purchase heroin from the co-defendant. He stated that any communication with the co-defendant regarding the purchase of heroin would have been through the defendant. Mr. Barnhill said Mr. Wiley was unaware that the co-defendant was at Mr. Wiley's home to sell drugs to Mr. Barnhill. When the co-defendant mentioned the drugs, Mr. Wiley told him to leave. The co-defendant and Mr. Barnhill walked outside while the defendant remained inside Mr.

Wiley's home. Mr. Barnhill stated that he intended to purchase drugs from the co-defendant but that the co-defendant was "heated" or "mad" at Mr. Wiley.

Mr. Barnhill testified that he did not recall what was said but that the co-defendant pulled out his gun. Mr. Barnhill stated that he was unarmed and that he did not threaten or hit the co-defendant before the co-defendant produced the gun. Mr. Barnhill struck the co-defendant, who then fell and "racked" the gun. Mr. Barnhill fell on top of the co-defendant and attempted to take the gun away from him. Mr. Barnhill stated that the co-defendant fired the gun multiple times during the struggle and told him that "you're dead." Mr. Barnhill responded, "[N]ot if I kill you first." Mr. Barnhill believed Mr. Humphrey came to the area but explained that he was focused on taking the gun away from the co-defendant. Mr. Barnhill testified that "[i]t just seemed like it all happened so fast" and that "[i]t was just shot after shot after shot."

Mr. Barnhill testified that the defendant used a taser on him two or three times and that he released the co-defendant once the defendant used the taser on his neck. Mr. Barnhill heard the co-defendant state, "[G]rab the gun," and Mr. Barnhill fled to a wooded area. He fell several times while fleeing, and once he hid at the bottom of a hill approximately 100 yards away, he discovered that he had been shot in his knee. He did not know whether he was shot before or after the defendant used the taser on him.

Mr. Barnhill was transported by ambulance to a hospital where surgeons removed the bullet from his knee. He awoke to find his leg wrapped in bandages, and he left the hospital against medical advice because he did not want to be in a position where he would be required to testify at a trial. He affirmed that he had a scar on his leg as a result of the bullet wound.

During cross-examination, Mr. Barnhill agreed that the co-defendant did not point the gun at him when the co-defendant first produced the gun and that Mr. Barnhill struck the co-defendant as soon as he produced the gun. Mr. Barnhill believed shots were fired before the defendant exited the home. Once the defendant exited the home, she went to her vehicle, retrieved the taser from her purse, and used the taser on Mr. Barnhill two or three times. Mr. Barnhill confirmed that he heard additional gunshots as he was fleeing. He stated that while hiding, he did not initially answer those who were calling for him because he did not know who was calling for him, and he was afraid.

Tina Chunn, Mr. Wiley's mother, testified that the defendant was married to one of her other sons and that she had known the co-defendant since he was a child. She stated that on October 4, 2020, at 10:05 p.m., she received a call from the co-defendant's telephone number but that she did not answer it. At 10:29 p.m., she received a call from the defendant's telephone number, and when she answered the call, she recognized the

voice of the caller as belonging to the co-defendant. The co-defendant told Ms. Chunn that "what happened at Kerry's house stays at Kerry's house" and that she could "let Kerry know that if there is any police involved or any problems, then there will be more problems." Ms. Chunn testified that she began cursing the co-defendant and that the co-defendant responded that "since I'm the mommy dearest I am and I want to protect everybody, then I could be took care of, too." Ms. Chunn read her statement to the police in which she reported that the co-defendant called her from the defendant's cellular telephone and stated, "You tell them at Kerry's that what happened is what it is . . . . [I]f any police is involved, I will start with kids, and since you're the bad-a** mommy dearest, I will take you out, too, b****."

Lieutenant Sam Voss with the Maury County Sheriff's Department assisted in processing the scene at Mr. Wiley's home. He located one unspent nine-millimeter round and four spent nine-millimeter shell casings in the area outside the home. He noted that another spent nine-millimeter shell casing was apparently later recovered, but he was not present when it was recovered. A reddish brown substance that was consistent with blood was on the front bumper of a white vehicle parked in the driveway and on the ground at the bottom of the steps to the home. Lieutenant Voss recovered a plastic baggie on the ground outside the home. The baggie contained two individual baggies, one of which contained 3.99 grams of cannabis and the other contained .69 grams of cannabis and methamphetamine. Lieutenant Voss identified two bullet holes in the front window toward the end of the home and a corresponding bullet hole in an interior wall of the home.

In January 2021, the co-defendant was arrested in Williamson County after he wrecked a vehicle while fleeing from police officers. While searching the vehicle, officers recovered two "security-style lock boxes" in the back floorboard. Officers searched the lock boxes pursuant to a search warrant and discovered a Smith & Wesson nine-millimeter pistol that had one bullet in the chamber and seven bullets in the magazine, additional magazines, a plastic bag containing nine-millimeter bullets, a 12-gauge shotgun shell, a laser sight, and a holster that could hold a nine-millimeter pistol.

Special Agent Alex Brodhag, a firearms examiner with the Tennessee Bureau of Investigation, examined the nine-millimeter pistol recovered from the lock box and the nine-millimeter cartridge casings recovered at Mr. Wiley's residence and concluded that the cartridge casings were fired from the pistol. He stated that the unspent nine-millimeter round had extractor markings indicating that the round had been extracted from a firearm but that the markings did not provide sufficient detail to link the round to the pistol.

The State rested. After a *Momon* colloquy, the defendant and the co-defendant elected not to testify, and they did not present any proof.

- 7 -

The jury acquitted the defendant and the co-defendant of coercion of a witness and the defendant of attempted first degree murder of Mr. Barnhill. The jury convicted the co-defendant of attempted first degree murder of Mr. Barnhill resulting in serious bodily injury, reckless endangerment as a lesser included offense of attempted first degree murder of Mr. Humphrey, attempted first degree murder of Ms. Schreffler, possessing a firearm as a convicted felon, reckless endangerment by firing into an occupied habitation, vandalism of property in an amount of $2,500 or more but less than $10,000, and employing a firearm during the commission of a dangerous felony. The jury convicted the defendant of reckless endangerment as a lesser included offense of attempted first degree murder of Mr. Humphrey, facilitation of attempted first degree murder of Ms. Schreffler as a lesser included offense of attempted first degree murder, misdemeanor reckless endangerment as a lesser included offense of reckless endangerment by firing into Mr. Wiley's occupied home, and facilitation of vandalism of property in an amount of $2,500 or more but less than $10,000 as a lesser included offense of vandalism.

During the defendant's sentencing hearing, the State agreed that the defendant was a Range I offender. The State noted that although the defendant initially was released on bond while awaiting trial, the defendant's bond was revoked after she was arrested multiple times on new charges in Nashville. The State presented the testimony of Officers Rachel Susee and Andrew Brazee of the Metropolitan Nashville Police Department and Sergeant Misty Bolton of the Davidson County Sheriff's Office regarding the circumstances leading to the defendant's multiple arrests in April and May of 2021.

Officer Susee testified that on April 7, 2021, she responded to a call at a McDonalds regarding the defendant's attempted passing of a counterfeit $100 bill. Officer Susee stated that although the defendant maintained that the currency was not counterfeit, the currency showed "obvious lack of consistency" with a typical $100 bill. Officer Susee arrested the defendant and transported her to the Davidson County Sheriff's Office for booking.

Sergeant Bolton testified that she booked the defendant following her arrest and that a body scan of the defendant revealed "an abnormal image in the vaginal area, which indicated to us that she could be concealing something." Sergeant Bolton conducted a strip search of the defendant, which required that the defendant remove one item of clothing at a time and give it to Sergeant Bolton. Sergeant Bolton stated that the defendant attempted to conceal an item in one hand while removing her pants with her other hand. The defendant refused multiple commands to give the item to Sergeant Bolton, and the defendant put the item into her mouth in an effort to swallow it. Sergeant Bolton deployed a "chemical agent" to the defendant's face, and officers placed the defendant against the wall in an attempt to restrain her. At that point, the item, which was contained in a plastic bag, was in the defendant's hand. Sergeant Bolton stated that as officers were attempting

to handcuff the defendant and remove the item from the defendant's hand, the plastic bag was torn open, and the "white crystal-like substance" that was in the bag "kind of went everywhere." Sergeant Bolton gathered the "white crystal-like substance," placed it in a plastic bag, and gave it to Officer Susee.

Officer Susee testified that she conducted a field test of the substance, and the substance was positive for methamphetamine. She estimated the quantity of the drug to be 18 grams. As a result, the defendant also was charged with bringing contraband into a penal institution.

Officer Brazee testified that on May 31, 2021, he responded to a call at a Walmart regarding the recovery of a stolen vehicle, a white Chevy Cruze. He stated that surveillance video from Walmart showed the defendant driving the vehicle into the parking lot followed by an orange pickup truck driven by Josh Buchanan. The defendant parked the vehicle and entered the orange truck. The truck traveled down one of the aisles and then returned to the white vehicle. Mr. Buchanan exited the truck and attempted to start the white vehicle. Officer Brazee explained that the OnStar program in the vehicle had a "slow-down feature," which led the defendant to believe that the vehicle was either running out of fuel or was having mechanical issues, and that once the vehicle was stopped, a mechanical lock was initiated, which prevented the vehicle from restarting until a signal was sent.

Officer Brazee testified that he spoke to the defendant who stated that she came to Nashville by bus, entered the white vehicle, which was unlocked, and took the wallet of the vehicle's owner. The defendant denied driving the white vehicle. Officers subsequently learned that the orange truck was also reported as stolen. The defendant was arrested and charged with theft of property valued at $10,000 or more. Officer Brazee testified that during a search of the defendant incident to her arrest, he discovered a small bag of a "crystalline substance" on the defendant's person, and she admitted that the substance was an "eight ball" of methamphetamine. As a result, the defendant also was charged with possession of methamphetamine.

Ms. Schreffler testified regarding the damage to her vehicle as a result of the shooting and agreed that the total cost of repairs to the vehicle was $5,340. She stated that during the shooting, she was in fear of her life and that the shooting sent her "anxiety through the roof" and made her "paranoid." She eventually moved as a result of the shooting.

Ms. Schreffler testified that four children and six adults were inside her home at the time of the shooting at her home. Those children and adults had just fled to her home as a result of the initial shooting and were afraid. Ms. Schreffler stated that she instructed

Ms. Swauger to hide the children in the bathroom, and the children were in the bathroom at the time of the shooting at Ms. Schreffler's home. During cross-examination, Ms. Schreffler testified that the bathroom was located in the back of the home and on the opposite side from where the shots were fired. She did not believe that there were any bullet holes in her home as a result of the shooting.

The State entered the defendant's presentence report as an exhibit and presented the testimony of Monique Wells, the probation officer who prepared the presentence report. The trial court continued the sentencing hearing to allow the State to obtain additional information regarding the defendant's criminal history. During a subsequent hearing, the State filed an addendum to the presentence report.

According to the addendum, the defendant had prior convictions for possession of marijuana and illegal possession or use of a credit or debit card and four prior theft convictions. In September 2016, the defendant's term of diversion was revoked as a result of her arrest for theft and her failure to report the arrest, and she was placed on supervised probation. In October 2017, the defendant's probation was revoked after she was arrested for another theft charge and failed a drug screen. In January 2020, the defendant was arrested for driving under the influence, and she was released on bond for the offense when the instant offenses occurred. She pleaded guilty to driving under the influence in April 2022. Ms. Wells affirmed that the defendant's criminal charges related to her two arrests in Davidson County while on bond for the instant offenses were still pending.

Ms. Wells testified that the defendant reported that she began using opiates at the age of 20 after experiencing a miscarriage. The defendant reported that she used opiates on a daily basis for a long period of time until she became clean following an arrest. She stated that she began using drugs again in 2019 after her brother passed away and that she used methamphetamine on a daily basis until her current period of incarceration. She said that she had never participated in a long-term rehabilitation program and that she had been accepted into a one-year rehabilitation program.

During cross-examination, Ms. Wells testified that based on the risk and needs assessment, the defendant was a low risk to reoffend. During redirect examination, she testified that the assessment was primarily based upon the defendant's responses to questions posed and her circumstances within the most recent six months of her life during which the defendant had been incarcerated. Ms. Wells agreed that the assessment did not necessarily take into account the defendant's behavior prior to her incarceration.

The defendant presented the testimony of Christopher McCormick, the president of Cross Style International and Executive Director over the Cross Style Life

Recovery branch. Mr. McCormick testified that the defendant had been accepted into the residential recovery program, which is a one-year program specializing in alcohol and drug addiction.

During the defendant's allocution, she apologized for her actions and stated that she would have never placed the children in harm's way and that "[w]hen on drugs, it's not me." She requested the opportunity to go to a "halfway house."

The trial court stated that in determining the defendant's sentence, the court considered the evidence presented during the trial and the sentencing hearing, the general principles of sentencing, arguments regarding sentencing alternatives, the nature and characteristics of the criminal conduct involved, mitigating and enhancement factors, statistical information regarding sentencing practices for similar offenses, the defendant's allocution, and her potential for rehabilitation. The court recognized that it was required to impose a sentence that was justly deserved in relation to the seriousness of the offenses, assure fair and consistent treatment, and avoid disparities in sentencing.

The trial court found that the 29-year-old defendant had been involved in the criminal justice system since the age of 22, that she had six prior misdemeanor convictions, that she had been sentenced to diversion and probation five times, and that her terms of diversion and probation had been revoked on two occasions. The court noted that the defendant was released on bond for a charge of driving under the influence when she committed the instant offenses. The court further noted that while the defendant was released on bond for the instant offenses, she was arrested for "serious" charges in Davidson County and that her bond was revoked as a result.

The trial court noted that the defendant began abusing opiates at the age of 20 and stopped doing so following an arrest and that after the defendant's brother passed away in 2019, she began using methamphetamine on a daily basis until her incarceration for the present offenses. The court stated, "I see nothing in the record except now that the stakes are high, she would like to have some long-term treatment, I am sure to keep her out of the penitentiary." The court considered the defendant's potential for rehabilitation and the risk that she might commit another crime during any period of probation and stated that "the history that I have just gone into is disturbing in that regard." The court declined to consider the defendant's results on the risk and needs assessment, noting that the assessment primarily relied upon self-reported and unconfirmed data and gauged the defendant's conduct within the last six months during which the defendant was incarcerated. The court found that the defendant had "a very flat affect" during the trial and the sentencing hearing and that "I see no remorse on the part of [the defendant]. I hope there is. But I see more of an attitude that now I am moved from misdemeanor sentencing to felony sentencing and I'm looking at eight to 12 years so I need to show some remorse."

The court found that measures less restrictive than confinement had been frequently or recently applied and that those measures were unsuccessful.

The trial court determined that "[w]hen you go in the middle of the night and shoot up a trailer and a car with not knowing who is inside that trailer, not really caring who is inside that trailer and who is outside of it, the interest of society need to be protected." The court found that probation would unduly depreciate the seriousness of the offense and that confinement is necessary "to provide an effective deterrent to those likely to go in and shoot up a trailer with innocent people in it."

The trial court applied enhancement factor (1), the defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and gave "great weight" to the enhancement factor. T.C.A. § 40-35-114(1). The court applied enhancement factor (3), "[t]he offense involved more than one (1) victim," to the defendant's conviction for facilitation of attempted first degree murder. *Id.* § 40-35-114(3). The court gave the enhancement factor "great weight," finding that the offense involved firing "Willy-nilly into a house or around a house when there are children there, and particularly after what had gone on right before that at that trailer park." Based upon this reasoning, the court also applied enhancement factor (10), "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," and gave the enhancement factor "great weight, substantial weight." *Id.* § 40-35-114(10). Finally, the court applied enhancement factor (13), finding that at the time that the felony was committed, the defendant was released on bond for a pending charge of driving under the influence, and the court gave the enhancement factor "great weight." *Id.* § 40-35-114(13)(A). The court found that no mitigating factors applied.

The trial court found that the defendant was a Range I offender and imposed concurrent sentences of ten years and six months for the conviction of facilitation of attempted first degree murder, one year for the facilitation of vandalism conviction, and eleven months and twenty-nine days for each reckless endangerment conviction. The court ordered the defendant to pay restitution in the amount of $5,348.

Following a timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. On appeal, she challenges the sufficiency of the evidence supporting her conviction for facilitation of attempted first degree murder and the length and manner of service of her sentence.

## I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence only with respect to her conviction for facilitation of attempted first degree murder. Specifically, she asserts

that the evidence did not establish that she assisted the co-defendant knowing that he intended to attempt to kill Ms. Schreffler. The State responds that the evidence is sufficient to support the conviction. We agree with the State.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(c); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Pursuant to Code section 39-12-101(a),

> [a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result the would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a). A person is criminally responsible for the conduct of another under Code section 39-11-402(2) if,

"[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2). Code section 39-11-403(a) "applies to a person who facilitates criminal conduct of another by knowingly furnishing substantial assistance to the perpetrator of a felony, but who lacks the intent to promote or assist in, or benefit from, the felony's commission." *Id.* § 39-11-403, Sentencing Comm'n Comments.

The defendant asserts that the evidence did not establish the elements of facilitation. She acknowledges that based on the evidence presented at trial, the jury could have inferred that she was driving the vehicle at the time of the shooting at Ms. Schreffler's home and that she provided substantial assistance to the co-defendant. However, she maintains that the evidence did not establish that she assisted the co-defendant knowing that he intended to attempt to kill Ms. Schreffler.

The evidence presented at trial, when viewed in the light most favorable to the State, established that the co-defendant became angry when Mr. Wiley ordered him to leave after the co-defendant asked him whether he knew anyone who wanted heroin. Mr. Barnhill followed the co-defendant outside intending to purchase heroin from him. The co-defendant produced a gun; Mr. Barnhill struck him; they began struggling over the gun; and the co-defendant fired the gun multiple times. Some of the gunshots entered the bedroom where Mr. Wiley's son was sleeping. Although the defendant was inside Mr. Wiley's home when the shooting began, she ran outside, retrieved her taser, and used it on Mr. Barnhill multiple times in an attempt to aid the co-defendant. The co-defendant continued shooting as Mr. Barnhill fled, and at some point, the co-defendant shot Mr. Barnhill in his leg.

The defendant and the co-defendant drove away from the scene, but then they returned and entered the driveway leading to Ms. Schreffler's home where Mr. Wiley and several adults and children had fled during the shooting outside Mr. Wiley's home. When the vehicle entered the driveway, Ms. Schreffler mistakenly believed Mr. Barnhill was in the vehicle and yelled his name multiple times. Ms. Schreffler testified that she saw a woman driving the car, and the defendant acknowledges on appeal that she was the driver. The defendant slowed the vehicle to a "creep," and then she hit the gas and drove into Ms. Schreffler's yard not far from where Ms. Schreffler was standing. Ms. Schreffler testified that the vehicle "paused for a second" with its headlights on her. The co-defendant fired multiple shots at Ms. Schreffler, who stated that she continued hearing gunshots as she ran inside her home. The defendant then drove the co-defendant back to Mr. Wiley's home where the co-defendant shot at the home while Mr. Humphrey was standing outside the home.

- 14 -

The evidence established that the defendant provided substantial assistance to the co-defendant by driving him back to the area where the shooting occurred, accelerating down the driveway toward Ms. Schreffler and her home, and then driving him away from the scene after the co-defendant shot at Ms. Schreffler multiple times. The jury also could reasonably infer that the defendant was aware of the co-defendant's intent to kill Ms. Schreffler as the defendant slowed and then accelerated the vehicle in which the armed defendant was a passenger down the driveway and toward Ms. Schreffler. We, therefore, conclude that the evidence is sufficient to support the defendant's conviction for facilitation of attempted first degree murder of Ms. Schreffler.

## *II. Sentencing*

The defendant asserts that the trial court erred "in enhancing [her] sentence above the minimum in the range and sentencing [her] to incarceration as opposed to an alternative sentence." She maintains that "the record does not support the trial court's reliance upon the enhancement factors." However, the defendant makes no argument in her brief in support of these claims and, therefore, has waived the issues. *See* Tenn. R. App. P. 27(a)(7)(A) (providing that an appellate brief shall include "the contentions of the appellant with respect to the issues presented, and the reasons thereof, including the reasons why the contentions require appellate relief"); Tenn. Ct. Crim. App. R. 10(b) (providing that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"); *see also Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Regardless of waiver, we agree with the State's contention that the sentence imposed by the trial court is supported by the record.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were consider, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence

is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709. The same standard of review also applies to a trial court's decision regarding "probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

As a Range I offender, the defendant was subject to a sentencing range of eight to 12 years for facilitation of attempted first degree murder, a Class B felony. *See* T.C.A. §§ 39-11-117(a)(2); 39-11-403(b); 40-35-112(a)(2). The trial court imposed a mid-range sentence of 10 years and six months for the offense.[1] The trial court imposed the sentence after articulating its reasons in accordance with the purposes and principles of sentencing, considering the presence and absence of enhancement and mitigating factors, and weighing those factors. Thus, we will review the within-range sentence imposed by the trial court under an "abuse of discretion standard with a presumption of reasonableness." *Bise*, 380 S.W.3d at 708.

The trial court properly applied enhancement factor (1), the defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" based upon the defendant's numerous prior criminal convictions and history of illegal drug use. *See* T.C.A. § 40-35-114(1). The record reflects that the defendant was released on bond for a charge of driving under the influence when she committed the instant offenses, thus supporting the trial court's application of enhancement factor (13). *See id.* § 40-35-114(13).

With respect to the trial court's application of enhancement factor (10), we note that even where a risk to human life is inherent in the underlying conviction, this enhancement factor may still be applied where "there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." *State v. Trent*, 533 S.W.3d 282, 294 (Tenn. 2017) (citations omitted). Enhancement factor (10) "looks to the circumstances of the offense for which a defendant is being sentenced." *Id.* at 295 n.8. The record reflects that the defendant facilitated the firing of numerous shots toward Ms. Schreffler's mobile home where several people sought safety after the co-defendant had earlier fired into another mobile home that had been occupied by the same people. We conclude that the trial court did not err in applying enhancement factor (10).

The State concedes that the trial court misapplied enhancement factor (3), "[t]he offense involved more than one (1) victim," *see* T.C.A. § 40-35-114(3), because the indictment charged that the offense was committed against Ms. Schreffler, a specific,

---

[1] The trial court imposed the minimum sentence of one year for facilitation of vandalism of property in an amount of $2,500 or greater but less than $10,000, a Class E felony. *See* T.C.A. §§ 39-14-105(a)(3); 39-14-408(c)(3); 40-35-112(a)(5). The trial court imposed the authorized sentence of 11 months and 29 days for each conviction of reckless endangerment, a Class A misdemeanor. *See id.* §§ 39-13-103(b)(1); 40-35-111(e)(1).

named victim. *See State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002) (concluding that "there cannot be multiple victims for any one offense of aggravated assault committed against a specific, named victim," in contrast to aggravated arson, which permits only one conviction regardless of the number of people victimized by a fire). However, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. The trial court properly applied three enhancement factors, found that no mitigating factors were applicable, weighed the enhancement factors, and considered all the relevant principles associated with sentencing when imposing the sentence. We conclude that the trial court did not abuse its discretion by imposing this within-range sentence.

Although the defendant asserts that the trial court erred in failing to impose an alternative sentence, we note that the defendant was not presumed to be a favorable candidate for alternative sentencing with respect to her conviction for facilitation of attempted first degree murder, a Class B felony. *See* T.C.A. § 40-35-102(6) (providing that a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing). Furthermore, because the defendant's sentence was greater than 10 years, she was not eligible for probation. *See id.* § 40-35-303(a). Regardless, the defendant failed to satisfy her burden of proving her suitability for probation. *See id.* § 40-35-303(b). The trial court made extensive findings emphasizing that confinement was necessary in light of the defendant's long history of criminal conduct and because measures less restrictive than confinement had frequently or recently been applied unsuccessfully to her. *See id.* § 40-35-103(1)(A), (C). The trial court emphasized the defendant's prior criminal history, her history of illegal drug use, her history of failing to comply with the requirements of diversion and probation, and her continued commission of criminal offenses while released on bond. The defendant did not challenge the trial court's findings on appeal. We conclude that the record supports the trial court's order denying an alternative sentence and requiring the defendant to serve her sentence in confinement.

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

- 17 -